**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 10-60189-cr-COHN/SELTZER**

UNITED STATES OF AMERICA

vs.

COASTAL SHIPPING HOLDING, LLC,
                    Defendant.
_____/

## PLEA AGREEMENT

The United States of America and COASTAL SHIPPING HOLDING, LLC (hereinafter referred to as "COASTAL SHIPPING" or the "defendant") enter into the following agreement:

**PROFFER OF FACT**

1.       The defendant and the United States agree that the United States could prove the following facts beyond a reasonable doubt:

a.  COASTAL SHIPPING is a closely-held holding company and coastal marine freight company with a principal place of business of 1300 Eller Drive, Fort Lauderdale, Florida 33316.  The Managing Members of COASTAL SHIPPING are individuals Steven R. Ganoe ("GANOE") and Michael J. Grandonico ("GRANDONICO").

b.  GANOE and GRANDONICO also own and control a closely held coastal marine company named G &G Marine, Inc. ("G & G Marine").  G & G Marine's principal place of business is also 1300 Eller Drive, Fort Lauderdale, Florida 33316.  G & G Marine, Inc. oversees the marine technical management of several vessels, including the deck and engine departments of vessels owned by COASTAL SHIPPING and other companies in

1

which GANOE and GRANDONICO have an ownership interest and/or control the technical management of vessels or direct cargo movement of these vessels.

c.  The M/V ISLAND EXPRESS I is a 155-foot cargo ship with a Gross Registered Tonnage of 422 GT and which makes regular calls to its home port in Port Laudania, Florida in Broward County.

d.  The M/V ISLAND EXPRESS I is registered in the Republic of Panama under the International Maritime Organization call sign number HO-7799.  The M/V ISLAND EXPRESS I typically engages in two- to three-day voyages from Ft. Lauderdale to ports in the Bahamas and Turks and Caicos.

e.  The United States is part of an international treaty that regulates the discharge of oil from vessels at sea: the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 ("MARPOL").  Congress implemented MARPOL in the United States through the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901 *et seq.*  The United States is a party to MARPOL.  MARPOL, APPS and regulations promulgated pursuant to APPS apply to all commercial vessels operating in United States waters or at United States ports, including vessels operating under the authority of a country other than the United States.

f.  At all relevant times, the M/V ISLAND EXPRESS I was outfitted with a Bilge Boy 2.5 gpm Oil Water Separator, manufactured by Fleetguard Filtration Systems.  During the normal course of operation of a ship, oil and water accumulate and mix in the engine spaces of a ship.  This oil and water mix is known as "bilge."  MARPOL and APPS prohibit discharges of bilge into the ocean unless the effluent has been purified to an oil

2

content of less than 15 parts per million ("ppm"). An Oil Water Separator, such as the Bilge Boy, is the principal technology used to lower the petroleum content of oil-contaminated water to less than 15 ppm. MARPOL requires that every non-oil tanker over 400 gross tons have a functioning Oil Water Separator or other oil filtering equipment capable of satisfying the requirements of Annex I of MARPOL.

g. At all relevant times, the engine spaces of the M/V ISLAND EXPRESS I were configured so that the ship's bilge could be piped directly into the ship's Oil Water Separator for purification or directly overboard into the ocean without purification. The ship did not have a holding tank to store bilge prior to its delivery to its Oil Water Separator.

h. From as early as February 7, 2010 to May 4, 2010, the M/V ISLAND EXPRESS I's Oil Water Separator was inoperable.

i. From as early as February 7, 2010 to May 4, 2010, the defendant failed to supply to the M/V ISLAND EXPRESS I cleaning products and replacement parts that were necessary to properly maintain and operate the ship's Oil Water Separator. Additionally, the crew of the M/V ISLAND EXPRESS I failed to perform the monthly long term maintenance outlined in the Oil Water Separator's Operations and Installation Instructions.

j. From as early as February 7, 2010 to May 4, 2010, the Chief Engineer of the M/V ISLAND EXPRESS I did not know how to operate the Oil Water Separator and could not locate its operation manual.

k. From as early as February 7, 2010 to May 4, 2010, the engine shaft seals on the M/V ISLAND EXPRESS I leaked above the engine bilge area. This leak caused sea water to

3

enter the ship's engine room spaces, where oil and water accumulate and mix to create bilge, at a rate of up to nine to ten gallons per hour.

l.      On May 4, 2010, the United States Coast Guard conducted a port state control examination of the M/V ISLAND EXPRESS I at the G & G port in Port Laudania, Florida. The inspectors noticed two submersible, portable pumps on board the ship. One of the pumps was sitting in a bilge space beneath the starboard engine shaft. This pump was connected to PVC hose that was mounted into the engine room starboard bulkhead. The hose led up to the main deck of the ship, through the starboard gunwale to the outside of the ship. Any fluid pumped through this system would flow across a couple feet of the main deck and then fall overboard into the ocean. The second submersible, portable pump was sitting on the engine room deck. Although the second pump was not attached to PVC hoses, the port bulkhead had the same system PVC hosing bolted onto it that the inspectors found on the starboard bulkhead. The bottom end of the hosing fit the end of the submersible pump, and the top end of the piping was also set up to flush fluid across the port side of the deck and overboard.

m.      The Coast Guard inspectors noticed brush marks and spots of dry paint on the PVC hose that was drilled into the engine room bulkheads. The color and age of the paint matched the color and age of the paint on the engine room bulkheads.

n.      The crew of the M/V ISLAND EXPRESS I routinely discharged the ship's bilge in the machine spaces directly into the ocean without processing it through the Oil Water Separator and without ensuring that the oil content of the effluent was less than 15 ppm. They ran the submersible pumps during those periods when the M/V ISLAND EXPRESS I

4

was underway in order to maintain a low level of bilge. The submersible pumps are not approved oil filtering equipment and could not calculate the oil content of the bilge they pumped into the ocean.

o. From as early as February 7, 2010 to May 4, 2010, the crew of the M/V ISLAND EXPRESS I also used the ship's fixed piping to flush bilge directly from the engine room spaces into the ocean without processing it through any oil filtering equipment and without ensuring that the oil content of the effluent was less than 15 ppm.

p. The Coast Guard inspectors examined the M/V ISLAND EXPRESS I's Oil Record Book. The Oil Record Book revealed that the ship had not used its Oil Water Separator since January 4, 2007. The Oil Record Book further did not contain any entries reflecting the discharge of bilge from January 4, 2007 to May 4, 2010. In other words, there were no entries for usage of the Oil Water Separator, no entries for accidental discharges, no entries for emergency discharges, and no entries for offloads to shore facilities equipped to receive and handle bilge. By contrast, the Oil Record Book revealed that from February 5, 2006 to January 4, 2007, the crew of the M/V ISLAND EXPRESS I used the Oil Water Separator 21 times to purify a total of at least 1,315 gallons of bilge.

q. Between February 7 and May 2010, the M/V ISLAND EXPRESS I visited Port Laudania, a United States port in Broward County, Florida, on at least twenty-five occasions, including February 7, 2010, and May 3, 2010.

**TERMS OF THE AGREEMENT**

2.     The defendant agrees to plead guilty to counts one and two of the information, which counts charge the defendant with failure to maintain an accurate Oil Record Book, in violation of Title 33, United States Code, Section 1908(a).  The elements of this offense are:

      a.   That the M/V ISLAND EXPRESS I was ship of 400 gross tons and above other than an oil tanker;

      b.   That the Defendant failed to maintain an accurate Oil Record Book;

      c.   That the failure to maintain the Oil Record Book occurred while the M/V ISLAND EXPRESS I was in the navigable waters of, or at a port or place in, the United States; and

      d.   That the Defendant acted knowingly;

See 33 U.S.C. § 1908(a); 33 C.F.R. § 151.25.

3.     The defendant is aware that the sentence will be imposed by the court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines").  The defendant acknowledges and understands that the court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the court relying in part on the results of a Pre-Sentence Investigation by the court's probation office, which investigation will commence after the guilty plea has been entered.  The defendant is also aware that, under certain circumstances, the court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines.  The defendant is further aware and understands that the court is required to consider the advisory guideline range determined under

6

the Sentencing Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 2 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4.    The defendant also understands and acknowledges that the Court may impose a term of probation of not less than one year and not more than five years for each count. The United States and the defendant agree that, although not binding on the court, they will jointly recommend that the defendant receive a sentence of probation of three years.

5.    The parties also agree that, although not binding on the Court, that they will jointly recommend the following special conditions of probation:

a) That the defendant complies with the Environmental Compliance Plan ("ECP") that is contained in Attachment A to this Plea Agreement. The defendant understands and agrees that the ECP shall apply to the four subject vessels listed in the ECP. The ECP will be binding on the M/V ISLAND EXPRESS I and the M/V OCEAN EXPRESS I so long as these vessels are owned by COASTAL SHIPPING or remain under the ownership or technical management of COASTAL SHIPPING or G & G Marine. The ECP will be binding on the M/V CARIBBEAN EXPRESS I and the GULFSTREAM EXPRESS I so long as these vessels remain under controlling majority ownership or technical management of COASTAL SHIPPING or G & G

7

Marine. The defendant acknowledges its ability to apply the ECP to the four subject vessels listed in the ECP. If any of these four vessels are sold to a third party at an arm's length transaction and G & G Marine no longer oversees their technical marine management, that vessel will be relieved from this ECP.

b) The defendant understands and agrees that the ECP shall last until the earlier of 1) the defendant's satisfaction of the ECP, 2) the end of CSH's period of probation, or 3) the sale of the vessels to a third party and termination of G & G Marine's technical marine management of the vessel. The defendant further agrees and understands that, in addition to seeking revocation or modification of the defendant's probation pursuant to 18 U.S.C. §3565, the Office reserves the right to prosecute G & G Marine, Inc. if COASTAL SHIPPING 1) ceases to be an ongoing company for any reason prior to the completion of the ECP or 2) fails to complete the ECP.

c) That the defendant purchase and place a ½ - page notice in Florida Shipper magazine within 60 days of the date of sentencing. The notice will contain no words or representations other than those agreed to in this plea agreement. The advertisement will state:

> On July 16, 2010, COASTAL SHIPPING HOLDING, INC. pled guilty in the United States District Court for the Southern District of Florida to a felony count of maintaining an inaccurate Oil Record Book related to illegal discharges of bilge from the cargo freighter Island Express I, in violation of the Act to Prevent Pollution from Ships, Title 33, United States Code, Section 1908(a). The Island Express I is owned by Coastal Shipping Holding, LLC and was operated by G & G Marine, Inc. At the time of the illegal overboard discharges of bilge and the false entries in the Oil Record Book. Steven R. Ganoe and Michael J. Grandonico are the managers of both Coastal Shipping Holding, LLC and G & G Marine, Inc. They wish to express their profound regret for this action and shared commitment to ensuring that illegal discharges of hazardous pollutants and illegal record keeping never happen again from any vessel in the G & G Marine fleet.

8

6.     In addition to a term of probation, the court may impose a fine of up to $500,000 or twice the gross gain or loss per count.  The parties agree that, although not binding on the Court, that they will jointly recommend a fine of $700,000.

7.     The parties agree to recommend that $350,000 of the total criminal fine amount of $700,000 be suspended for the explicit purpose of COASTAL SHIPPING applying the suspended amount to performing Community Service pursuant to § 8B1.3 of the Federal Sentencing Guidelines and in furtherance of satisfying the sentencing principles provided for under 18 U.S.C. § 3553(a).  The explicit goal of COASTAL SHIPPING's required community service is to fund environmental projects and initiatives designed for the benefit, preservation and restoration of the environment and ecosystems in the waters of the United States in South Florida.  These projects are to include, but are not limited to coral reef science and restoration, marine resource enhancement and protection, and oil damage research and restoration. Accordingly, COASTAL SHIPPING agrees to pay a total of $350,000 of the total criminal fine amount to the South Florida National Parks Trust.   The South Florida National Parks Trust is a charitable and non-profit 501(c)(3) corporation that was established by the National Park Foundation to raise donations from individuals, businesses and foundations to support park programs in critical areas.

8.     COASTAL SHIPPING agrees that because the payments to the trust listed in paragraph 7 are community service by an organization, COASTAL SHIPPING will not seek any reduction in its tax obligations as a result of such community service payment.  COASTAL SHIPPING further agrees that because these payments are part of a criminal settlement agreed upon in his plea agreement, COASTAL SHIPPING will not characterize, publicize, or refer to

9

the payment as anything other than a community service payment made as a condition of probation incidental to a criminal conviction.

9.     The defendant further understands and acknowledges that, in addition to any fine imposed under paragraph 6 of this agreement, a special assessment in the amount of $100 will  be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

10.     The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.     Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

11.     The United States and the defendant agree that, although not binding on the probation office or the court, they will jointly recommend that the court impose a sentence within the advisory sentencing guideline range produced by application of the Sentencing Guidelines. Although not binding on the probation office or the court, the United States and the defendant further agree that, except as otherwise expressly contemplated in this Plea Agreement, they will jointly recommend that the court neither depart upward nor depart downward under the Sentencing Guidelines when determining the advisory sentencing guideline range in this case.

12.     The United States agrees that it will recommend at sentencing that the court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. The United States, however, will not be required to make this recommendation if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

13.     The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case.  Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or a variance from the guideline range that the court establishes at sentencing.  The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b).  However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the

11

defendant acknowledges that it has discussed the appeal waiver set forth in this agreement with its attorney. The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of its right to appeal the sentence to be imposed in this case was knowing and voluntary.

14.     The defendant is aware that the sentence has not yet been determined by the court. The  defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the court. The defendant understands further that any recommendation that the government makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and the court may disregard the recommendation in its entirety.  The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw its plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

15. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings unless contained in a letter from the United States Attorney's Office executed by all parties and counsel prior to the change of plea.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 7/16/10

By: _____
Jaime A. Raich
ASSISTANT UNITED STATES ATTORNEY

Date: 7/16/10

By: _____
LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR DEFENDANT

Date: 7/16/10

By: _____
STEVEN R. GANOE as Authorized
Representative of Defendant
COASTAL SHIPPING HOLDING, LLC

Date: 7.16.10

By: _____
MICHAEL J. GRANDONICO as Authorized
Representative of Defendant
COASTAL SHIPPING HOLDING, LLC

13

**ATTACHMENT A**
**Environmental Compliance Plan**

## PURSUANT TO PLEA AGREEMENT

**United States of America v. Coastal Shipping Holding, LLC,** 10-60189-cr-COHN/SELTZER.

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PROGRAM (ECP) have been prepared pursuant to the Plea Agreement between Coastal Shipping Holding, LLC (herein after "CSH") and the United States filed in the United States District Court for the Southern District of Florida. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement. The vessels covered under this ECP are:

(1) *Island Express I* – IMO Number 9210804

(2) *Caribbean Express I* – IMO Number 9233727

(3) *Gulfstream Express* – IMO Number 7304027

(4) *Ocean Express I* – IMO Number 7047459

These vessels are hereinafter referred to as the "subject vessels." By virtue of the closely held nature of CSH and its operating company, G & G Marine, Inc., CSH possesses the ability to implement the ECP on the subject vessels.

The ECP includes various provisions to ensure that the subject vessels which call or may call at ports or places in the United States, comply with all maritime environmental requirements established under applicable international, flag state, and port state law, including, but not limited to, the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL), and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA) and the Oil Pollution Act (OPA), and with the requirements of this agreement itself.

The ECP shall last until the earlier of 1) CSH's satisfaction of the ECP, 2) the end of the CSH's period of probation, or 3) the vessels are sold to a third party at arm's length and G & G Marine no longer provides technical marine management to the vessels.

## A. APPLICABILITY/PURPOSE

(1) This ECP shall cover and apply to the subject vessels. It shall also include all persons involved in the operation, maintenance and repair of the target vessels as direct employees or independent contractors.

(2) The ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purposes of this ECP are to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of the subject vessels which call or may call at ports or places in the United States, shore side facilities, and operations involving said vessels; to increase training of personnel involved with said vessels; and to require periodic reports to the United States Probation Office for the Southern District of Florida, the United States Attorney's Office for the Southern District of Florida, and the United States Coast Guard (collectively hereinafter "the United States") to ensure that the subject vessels follow the requirements of this ECP and that all the vessels comply with all maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations and that an effective environmental management system is in place to prevent recurrence of violations.

## B. CORPORATE COMPLIANCE MANAGER

(1) Within sixty (60) days of entry of the Plea Agreement, CSH shall designate a senior corporate officer as Corporate Compliance Manager (hereinafter "CCM") who shall report directly to the President and/or Managing Director of CSH. CSH shall provide the name of the CCM to the United States. The CCM should be the same individual as CSH's "designated person" under the International Safety Management Code (hereinafter "ISM") unless reasons are provided to the United States justifying why the "designated person" should not also be the CCM. The CCM shall be responsible for coordinating with the Independent ECP Consultant (hereinafter "IC"), as more fully described below, developing and implementing all of the procedures and systems required herein, establishing and implementing training programs for the officers and crew of CSH's operated and/or managed vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the IC and the United States. All reports required under this ECP shall be reviewed by the CCM and signed under the penalty of perjury.

(2) CSH shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees, and shore side personnel involved in the manning and/or operation of the subject vessels and agents of CSH as either direct employees or independent contractors, to notify the CCM of any violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the IC and the United States in carrying out their reviewing, auditing and oversight functions required by applicable law and this ECP. CSH agrees to establish a procedure that makes failure to notify the CCM of any violations of any applicable environmental requirements and failure to cooperate fully with the

2

Classification Societies, the IC and the United States in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. CSH agrees not to retaliate against any officer, crewmember, employee, or shore side personnel involved in the manning and/or operation of seagoing vessels, including all persons working for CSH and agents of CSH as either direct employees or independent contractors or entity making any such report.

(3) The CCM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of assuring compliance with the ECP. The CCM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CCM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the USAO, USPO, IC, the designated representative of the Coast Guard, and CSH. The CCM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses audit experience and is thoroughly familiar with the requirements of this ECP, and is knowledgeable about domestic and international maritime environmental laws and regulations.

(4) CCM Responsibilities:

    a. Development and Maintenance of Effective Training Programs

        - To the extent not already completed, the CCM will be responsible for developing training programs to educate and train CSH's employees of their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to the CSH's and to individuals for failure to comply with environmental laws.

    b. Auditing and Compliance Assessment

        - Ensure that the IC conducts the review and audits required by the ECP and that the required reports are prepared.

    c. Reporting of Non-Compliance by Employees and Crew Members

        - Establish a means by which employees may report (anonymously if so desired) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection.

## C. MASTER

(1) The Master of each of the vessels subject to this ECP, with the assistance of the CCM, shall ensure that prompt reports are made to the United States Coast Guard of any non-

Attachment A
Environmental Compliance Plan

United States v. Coastal Shipping Holding, LLC
10-60189-cr-JIC

compliant condition of any of CSH's vessels that call upon any port or place in the United States or sail into any waters under the jurisdiction of the United States.

## D. INDEPENDENT ECP CONSULTANT (IC) AND INITIAL ENVIRONMENTAL REVIEW

(1) Within thirty (30) days following the District Court's final imposition of sentence in <u>United States v. Coastal Shipping Holding, LLC</u>, the United States and CSH will jointly propose to the Court a list of IC's who meet the qualifications below to conduct an Initial Environmental Review, and a Report of Findings for all of CSH's operations as defined below. The Court shall select one of the IC's from the list and notify the United States and CSH of its selection in writing. If the Court accepts none of the IC's jointly proposed by the parties, the parties will propose a new list of IC's to the Court as expeditiously as possible.

(2) Qualified candidates for the IC position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by CSH to achieve and maintain compliance in respect to CSH's seagoing vessels. The IC shall also have sufficient expertise and competence to assess CSH's compliance with the ECP. CSH and the United States acknowledge that the functions of the IC may, by mutual agreement, be fulfilled by one or more individuals.

(3) The IC must not directly own any stock in any of CSH, its subsidiaries, affiliated business entities (owned wholly or partially by CSH) or any agents of CSH, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The IC must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If CSH has any other contractual relationship with the IC, both CSH and the IC shall disclose to the United States such past or existing contractual relationships.

(4) The IC shall conduct an Initial Environmental Review the subject vessels in port or while the vessels are underway and operating. CSH and the IC shall coordinate the underway inspections to accommodate, as much as practicable, the vessel's operations and schedule. The Initial Environmental Review shall be performed to ascertain and evaluate various aspects of the vessels: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, and other maritime environmental protection requirements.

(5) The Initial Environmental Review shall meet the following specific requirements:

4

(a) It shall assess all sources of oily waste and bilge found in each machinery space onboard the subject vessels. This will include observation and documentation describing the leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:
(i) all pump and valve seals and glands during operation,
(ii) all piping systems, flanges, gaskets, fittings and joints,
(iii) all equipment casings such as main and auxiliary engines, and reduction gears,
(iv) operation of engines, boilers, incinerators, and evaporators, and
(v) all other mechanical components found aboard CSH and G & G's vessels.

(b) It shall assess the adequacy and performance of the Oil Water Separator (OWS) and any other oil pollution prevention equipment to handle the quantities and types of wastes, developed during normal operations. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludges, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, modifications of all pollution prevention equipment, and notifications of equipment failure to the ECM or other shoreside personnel.

(c) It shall assess the adequacy of the vessel crewmembers to maintain the following records and includes a complete comparative analysis (against each other where possible) of the following records:
(i) Oil Record Book
(ii) Engine Room Alarms
(iii) Tank sounding sheets
(iv) Bilge waste and sludge receipts
(v) Wastewater Discharge Log
(vi) Oil to Sea Equipment Interface Logs
(vii) Content Monitor (OWS) calibration logs

(d) It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:
(i) Solvents
(ii) Degreasers
(iii) Oily rags
(iv) Contaminated fuels
(v) Used Oils and greases
(vi) Transformer oils

(e) It shall assess and evaluate documentation containing the certifications that all vessel officers understand the requirements of this ECP and shall require signed statements

by all vessel officers attesting that they understand false entries in the Oil Record Book for Machinery Space operations is a violation of law.

(f) It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

(g) It shall assess the adequacy of existing hotline reporting methods to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and shoreside personnel.

(h) It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

(i) It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including slops discharges, conditions of hoses, connections and transfer equipment, and shall include reviews of Declarations of Inspections.

(j) It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of vessels, including a review of the Shipboard Oil Pollution Emergency Plan and evaluation of personnel performing such duties.

(7) At the conclusion of the Initial Environmental Review, but in no event later than one hundred twenty (120) days following imposition of sentence, the IC shall prepare a Report of Findings. If the IC believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, CSH may request that the Government grant the IC such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to CSH and the United States. Based on the Report of Findings, CSH shall develop an Environmental Management System (hereinafter EMS) and Manual as described below.

(8) The IC shall at all times be empowered to report new violations of MARPOL, APPS, and the regulations promulgated pursuant to APPS.

## E. FINAL ECP COMPLIANCE AUDIT

(1) Beginning no more than ten (10) months and no later than twelve (12) months following the completion of the Initial Environmental Review, CSH shall arrange for, fund and complete a Final ECP Compliance Audit of the subject vessels to verify compliance with applicable environmental laws and regulations and the requirements of this ECP. All such vessels must be examined while the vessels are underway and operating by a Third Party Auditor ("TPA"). CSH and the TPA shall coordinate the underway examinations to accommodate, as much as practicable, the vessel's operations and schedule. These underway examinations will be conducted, to the extent practical, on voyages of short duration (i.e. four (4) days or less). The TPA will have full access to CSH's facilities, records, employees and officers at all times. During this final audit phase CSH shall immediately advise the TPA of any issue that comes to its attention that adversely impacts CSH's compliance with all applicable laws and regulations and the ECP.

(2) The TPA will be certified by the American National Standards Institute-Registration Accreditation Board or will have comparable credentials and experience in performing ECP audits. Selection of the TPA is subject to the same conditions identified in Section D above regarding selection of the IC.

(3) The Final ECP Compliance Audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance. The TPA shall assess conformance with the elements covered in the Initial Environmental Review and with the additional requirements of this plan. The TPA shall deliver each vessel's Audit Report to the appropriate company official upon completion. In addition, the TPA will deliver an Audit Report to the USPO, designated representative of the Coast Guard, and the United States Attorney's Office for the Southern District of Florida within thirty (30) days after the completion of each audit. If the TPA believes that additional time is needed to analyze available information or to gather additional information, CSH may request that the Government grant the TPA such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Audit Report. Should the Government or the United States Probation Office seek to revoke CSH's probation based on the TPA's failure to file a timely ECP Final Compliance Audit Report, CSH shall have the right to contest the reasonableness of such revocation in the appropriate U.S. District Court.

(4) The Final ECP Compliance Audit Reports shall present the Audit Findings and shall, at a minimum, contain the following information:
(a) Audit scope, including the time period covered by the audit;
(b) The date(s) the on-site portion of the audit was conducted;
(c) Identification of the audit team members;

Attachment A
Environmental Compliance Plan

United States v. Coastal Shipping Holding, LLC
10-60189-cr-JIC

  (d) Identification of the company representatives and regulatory personnel observing the audit;

  (e) The distribution list for the Final ECP Compliance Audit Report;

  (f) A summary of the audit process, including any obstacles encountered;

  (g) Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

  (h) Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

  (i) Certification by the TPA that the Final ECP Compliance Audit was conducted in accordance with this document and general audit principles.

(5) Within sixty (60) days from completion of the Final ECP Compliance Audit of a particular facility or vessel, CSH shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing CSH into full conformance with all applicable laws and regulations and the ECP manual for any Areas of Concern revealed in the Final ECP Compliance Audit. The Action Plan shall include the result of any root cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. CSH may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(6) The Action Plan shall be reviewed by the United States who shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, CSH shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, CSH shall submit a written Action Plan Completion Certification to the United States.

## F. NON-COMPLIANCE

(1) This ECP does not in any way release CSH from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

(2) The ECP shall be part of the Plea Agreement and adherence to it will be a condition of probation. Failure to comply with any part of this ECP (including but not limited to refusal to pay valid charges for the IC or TPA and failure to provide the IC or TPA access to vessels, facilities, personnel or documents) shall be a violation of the Plea Agreement and shall be grounds for the revocation or modification of CSH's probation. Should the United States or the United States Probation Office seek to revoke or modify CSH's probation based on CSH's

refusal to pay valid charges for the IC or TPA and/or its failure to provide the IC or TPA access to vessels, facilities, personnel, or documents, and/or as a result of any disagreement regarding any of the provisions of this ECP, CSH shall have the right to contest the reasonableness of such revocation before the appropriate U.S. District Court.

## G. CCM/VESSEL MASTER RESPONSIBILITIES

The Master of any of the subject vessels, with the assistance of the CCM, shall ensure that timely reports are made to the United States Coast Guard of any non-compliant condition of any of CSH's operated and/or managed vessels that calls upon any Port or Place in the United States or sails into any waters under the jurisdiction of the United States. CSH shall establish that enforcement of and employee compliance with the ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations and laws will be a negative factor in all appropriate personnel evaluations.

## H. TRAINING REQUIREMENTS

(1) The CCM will be responsible for developing training programs to educate and train vessel and shore side employees associated with the operation and management of the targeted vessels. Training shall occur annually for all employees and be performed by qualified instructors at a training facility. The training shall consist of pertinent sections of this ECP and existing marine environmental protection requirements. The training shall include shipboard-related technical and practical information associated with oil pollution prevention and the operation, maintenance and repair of oil pollution prevention equipment and systems, and be appropriate for the work responsibilities and department in which an employee works. The training must include discussion of the consequences to CSH and its employees for failure to comply with the requirements of this ECP and existing marine environmental protection requirements.

(2) Where possible, a basic initial training program shall be provided to vessel employees currently onboard vessels in an effort to promptly mitigate pollution risk and ensure environmental protection. However, such employees must receive the shore side training prior to returning to a vessel on a new contract.

(3) Additionally, the training shall include instruction regarding:

  (a) The reporting system used to report non-compliance.
  (b) Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability.
  (c) All requirements set forth in the Engineering section of this ECP.

(d) Position specific training in the operation, maintenance and repair of oily water separators, oil content discharge monitoring equipment, and other pollution prevention equipment.

## I. ENGINEERING REQUIREMENTS

(1) Unless otherwise stated, all of the requirements set forth below, if not in contravention of any Class, Treaty or other Flag State requirements, shall be implemented on the vessels covered under this ECP as soon as practicable, as determined by the CCM and not later than one year from the date of the signing of the plea agreement.

(2) Bilge Main Cross – Connections:
   (a) CSH shall immediately notify all of its vessels regarding the prohibition against non–emergency use of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The message shall state that the usage of these crossovers is similar to bypassing the OWS equipment and strictly prohibited.
   (b) The deck plates above or near the locations of these cross connections and the valves bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby - "Bilge System Piping Crossover - Emergency Use Only."
   (c) To prevent unauthorized usage, Chief Engineers shall place numbered seals on these valves.
   (d) The seal numbers shall be tracked in a seal number logbook and explanations shall be given anytime a crossover to the bilge main is opened. Seals shall be used in other areas of the machinery space. The Master of the vessel shall retain the replacement seals in the vessel's safe. He/she will keep an additional log documenting when seals are replaced and their respective numbers. The CCM will be responsible for ensuring fleet wide that no duplication of seal numbers occur and will have a master tracking document indicating which series were supplied to each vessel.
   (e) If the valves are remotely operated from the engine control room, the control must also be disabled and notice made near the associated push buttons or switches. They shall also be sealed.
   (f) All other bilge suction valves not connected to the bilge main, including independent emergency suctions to the vessel's engineroom bilges like those that may be connected to sea water circulating pumps, will be painted brightly and labeled similarly "Emergency Bilge Suction - Emergency Use Only." Their valve wheels will also have a numbered and logged seal capable of breakaway during emergency. Seal numbers shall be kept the in the Chief Engineer's official seal log book and explanations given for breakage or replacement.

(3) Blank Flanges:

Attachment A
Environmental Compliance Plan

United States v. Coastal Shipping Holding, LLC
10-60189-cr-JIC

    (a) To prevent unauthorized connections within the engine-room and machinery spaces of CSH's vessels, every blank flange associated with any piping leading overboard, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed or fitted with numbered seals through the flange bolts to prevent unauthorized connections and discharges. The seals used shall be numbered and records kept in the previously mentioned log.

    (b) The blank flange securing the bilge and sludge transfer system and the shore connection discharge valve at the discharge stations shall also require a numbered seal that will be maintained. Seal numbers shall be kept in the Chief Engineer's official seal log book.

## J. DOCUMENTATION AVAILABLE FOR INSPECTION

The CCM shall ensure that all documentation required by this ECP is maintained and available for inspection by the IC, TPA, and the United States Coast Guard. The Master of each of CSH's covered under this ECP, shall maintain on board the vessel, all records required by international conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this ECP, such as crew training records, and will make these records available to the IC, TPA, and the United States Coast Guard upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the United States by the IC and TPA.

## K. CHANGES IN OWNERSHIP/MANAGEMENT

The parties recognize that during the term of probation, the number and identity of vessels operated, managed, manned and/or controlled by CSH, G & G Shipping, Steven R. Ganoe, or Michael J. Grandonico that call on ports or places in the United States may increase or decrease. Any subject vessel which stops calling in the United States, shall be excluded from the scope of the ECP. CSH agrees that it will immediately (but in no event later than 21 days following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of any of the subject vessels. CSH agrees that this ECP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are managed, operated or manned by CSH, G & G Shipping, or an affiliated company. The CSH shall notify the United States before any vessel is released from the requirements of the ECP due to a change in ownership, management, manning or control.

Attachment A
Environmental Compliance Plan

United States v. Coastal Shipping Holding, LLC
10-60189-cr-JIC

## L. SELF-ENFORCEMENT

CSH further agrees that it will undertake and implement the necessary procedures to ensure that this ECP is diligently complied with by the officers and crew of each of the subject vessels, as well as by all shore side employees, managers and other employees who assist the operation of the subject vessels.

## M. REVISIONS/MODIFICATIONS

The requirements of this ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should CSH be unable to comply with any of the deadlines, CSH shall immediately notify the United States in writing of the reason(s) for non-compliance, and propose a revised timetable. The United States shall then determine as to whether the revised timetable should be accepted.

## N. REPORTS

All reports, documents and correspondence required under this ECP to be sent to the United States shall be sent to the following offices:

(a)  U.S. Attorney's Office for the Southern District of Florida
     99 N.E. Fourth Street, Suite 412
     Miami Beach, FL 33132
     ATTN: AUSA Jaime Raich

b)   United States Coast Guard Sector Miami
     Office of Prevention
     100 McArthur Causeway
     Miami, Florida 33139
     Attn: Designated Representative of the Coast Guard

(e)  U.S. Probation Department for the Southern District of Florida
     400 North Miami Avenue, Room 11-1
     Miami, Florida 33128
     Attn: Probation Officer

Attachment A
Environmental Compliance Plan

United States v. Coastal Shipping Holding, LLC
10-60189-cr-JIC

## O. SIGNATURES

The Defendant has read this ECP carefully and understands it thoroughly. Defendant enters into this ECP knowingly and voluntarily, and therefore agrees to abide by its terms. By its signatures below, the corporate representative agrees that he is duly authorized by the corporation's Board of Directors or equivalent governing structure pursuant to the same notarized legal document filed in United States v. Coastal ~~Marine~~ Shipping LLC certifying that the defendant companies are authorized to enter into and comply with all of the provisions of this Plea Agreement.

DATED:

COASTAL ~~MARINE~~ SHIPPING Holding, LLC

By:

STEVEN R. GANOE
Authorized Representative
of Coastal Shipping Holding, LLC
and G & G Marine, Inc.

MICHAEL J. GANDONICO
Authorized Representative
of Coastal Shipping Holding, LLC
and G & G Marine, Inc.

As counsel for the Defendant we represent, I have discussed with my company client and its duly authorized representative the terms of this ECP and have fully explained its requirements and its application to the subject vessels. I have no reason to doubt that my client is knowingly and voluntarily entering into this ECP.

DATED:

LILLY ANN SANCHEZ
Fowler White Burnett, P.A.
Counsel for Defendants

On behalf of the United States, the following agree to the terms of the ECP:

DATED: 7/16/10

JAIME A. RAICH
Assistant United States Attorney

13